**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Priscilla P., | ) | |
| | ) | |
|     *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 19 CV 50128 |
| | ) | Magistrate Judge Lisa A. Jensen |
| Andrew Marshall Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
|     *Defendant*. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff worked for 20 years as a forklift driver at the Nestle Distribution Center in DeKalb, Illinois, often working 12-hour days and 60-hour weeks. On a day in early December 2013, she woke up with severe pain in her lower back and hips. There was no obvious precipitating event, although medical records suggest she had some similar pain for several years. Since this day, Plaintiff has been on a "long journey" to find "answers for her pain." Dkt. 11 at 1, 13. She has seen multiple doctors (7 or 8 by one description) and tried numerous treatments, including multiple pain injections and two hip surgeries. She tried physical therapy several times (including 18 visits during one period in September 2014), has taken medications such as Tramadol, has visited a chiropractor and tried acupuncture. But despite these efforts, she has not found lasting improvement.

Plaintiff never went back to work at the forklift job because the company "let [her] go," presumably because of the medical problems. R. 22. She retained her current attorneys to first pursue a worker's compensation claim. As part of this effort, counsel obtained a medical opinion from Dr. Jeffrey Coe, who is board certified in occupational medicine. After examining Plaintiff and reviewing her history, Dr. Coe submitted a 10-page opinion letter dated August 4, 2015. He

1

concluded that Plaintiff "suffered repetitive strain injuries to her lower back and hips" from her forklift job and that these injuries aggravated "preexistent congenital abnormalities" in her hips. R. 1622. As for the possibility of working again, he opined: "Ms. [P] is unable to work as a standing forklift operator at this time and requires work in a largely seated position with position change as needed throughout the course of a workday." R. 1623.

A second opinion arising out of the worker's compensation case was provided by Dr. Michael Stover, who is in the Department of Orthopaedic Surgery at Northwestern Medicine. After examining Plaintiff and reviewing her medical history, Dr. Stover submitted a three-page letter dated March 11, 2016. (This date is significant as will become evident.) He concluded that Plaintiff had reached "maximal medical improvement" after seeing multiple doctors and trying multiple treatments, which did not provide "pain relief" or "significant improvement." R. 1637. He opined that working in "a sedentary or light duty position with changes of position during the day would be the most at which she could function in a work capacity." R. 1638.

On June 22, 2016, Plaintiff filed her application for Social Security disability benefits, alleging an onset date of December 9, 2013. She was then 45 years old; she is now 50 years old.

A hearing was held on January 26, 2018. Dr. Ashok Jilhewar testified as the impartial expert. His testimony is at the heart of this appeal. The ALJ gave his testimony "great weight" and rejected the opinions of Dr. Stover and Dr. Coe. R. 85. The Commissioner states, in the very first sentence of his brief, that this case is merely a "battle of the experts" and then argues in the body of his brief that the ALJ made the reasonable choice to rely on Dr. Jilhewar over the two other experts. Dkt. 16 at 1. Plaintiff does not totally reject this battle metaphor—perhaps because she has a 2-to-1 advantage—but she argues that there was not really a fair fight because the ALJ never seriously considered the two contrary opinions.

After reviewing the briefs and the record, the Court finds that a remand is warranted without having to wade deeply into this supposed battle of experts. The reason is that Dr. Jilhewar's testimony by itself is too confusing and unsupported to pass a threshold test of reliability. A bedrock principle in Social Security disability cases is that an ALJ must build a "logical bridge" from the evidence to the conclusions so that a later court can trace the path of the ALJ's reasoning. *See Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). By extension, this same principle should apply to Dr. Jilhewar's testimony given that it was the only medical opinion the ALJ relied on.[1] Without Dr. Jilhewar's testimony, the ALJ's decision turns into a layperson analysis.

Before considering Dr. Jilhewar's testimony in some detail, it will be helpful to first set out his overall framework. It is fairly complicated, dividing the four-year period into three time stages reminiscent of a three-act play. The first period runs from the onset date of December 9, 2013 until June 20, 2014. Dr. Jilhewar believed that Plaintiff was not disabled during this six-month period, which will sometimes be referred to as the "before period." The second period runs from June 20, 2014 up through March 11, 2016 (the date of Dr. Stover's examination). Dr. Jilhewar found that Plaintiff equaled Listing 1.04A during this 21-month period, hereinafter the "closed period." The third period starts on March 12, 2016 and continues indefinitely thereafter. For this period (the "after period"), Dr. Jilhewar found that Plaintiff no longer equaled Listing 1.04A because she had medically improved. Like a good three-act play, this framework contains several reversals of fortune. Specifically, Dr. Jilhewar concluded that Plaintiff's condition first worsened sometime around June 20, 2014 and then later improved sometime around March 11, 2016. This broad trajectory could be described as U-shaped. In contrast, Plaintiff's theory is

---

[1] The ALJ rejected the opinions of the State agency physicians. R. 85.

3

more analogous to a flat line. She claims that her medical problems have remained stuck in the same basic position since December 9, 2013. We will now look more closely at Dr. Jilhewar's testimony to try and extract the reasoning behind his framework.

After Plaintiff finished testifying, the ALJ called Dr. Jilhewar to testify, but he was not ready and asked for a recess for "[a]bout 10 minutes." R. 33. He later stated that the "extra time" was needed because the evidence relating to Plaintiff's many "injection procedures" was "interspersed throughout the medical record." R.35. In hindsight, the request for more time was a hidden red flag. Given the errors described below, one wonders whether Dr. Jilhewar had enough time to prepare and formulate his opinion.

The first half of his testimony is a summary of many specific medical findings from Plaintiff's treatment, focusing mostly on the closed period, with some bits of analysis interspersed within this longer discussion. The first such instance is the following explanation for why the June 20, 2014 date was chosen as the start of the closed period:

> Although the period at issue[] begins on December 9th, 2013, which is the onset of pain, I do not have invasive procedures done to help the pain until June 20, 2014. And, that is the date of documentation, in my opinion. 2F, page 5, is the reference. Since then, she [has received] various invasive interventions, usually of epidural steroid injections, many periods of intermittent physical therapies without significant benefit.

R. 34-35.

After this explanation, Dr. Jilhewar continued with his summary of the medical history. He noted test results (*e.g.* MRIs, EMGs, X-rays) and examination findings (*e.g.* tenderness, range of motion). This evidence is typically referred to as "objective evidence" in disability cases. His summary was not organized in a clear way, nor is it easy to follow. The chronology jumps around, and Dr. Jilhewar seemed unsure at times about the record citations and even some of the underlying facts. We will not summarize the details here. But two larger points should be noted.

4

First, Dr. Jilhewar consistently indicated that, aside from a few exceptions, the objective evidence showed that Plaintiff only had mild problems throughout the entire closed period.[2] As part of this summary, Dr. Jilhewar specifically mentioned Dr. Stover's March 11, 2016 examination, noting that he did not make any "abnormal clinical findings" other than a few findings of tenderness. R. 37. In summarizing this evidence, Dr. Jilhewar did not suggest that Dr. Stover's findings differed from the earlier findings made by other doctors. Second, Dr. Jilhewar consistently noted that Plaintiff did not receive any significant benefit from these treatments.[3]

At the end of this summary, Dr. Jilhewar then provided additional analysis, explaining why Plaintiff was no longer disabled as of March 11, 2016. The following explanation is puzzling in light of the two points just noted in the last paragraph:

> As of 3/11/2016, which is the *documentation of clinical findings of improvement, meaning the absence of neurological abnormalities*, except for tenderness in the lumbar spine and both hips. And, that is at 37F, page number two.[4] There *are no further invasive procedures or pain clinic interventions subsequent to 3/11/2016*. On the medical records, because of the intensity of pain management, there is a close period of equaling 1.04A beginning initial facet joint injection June 20, 2014, 2F, page five, ending 3/11/2016, 37F, page number two. While the documentation of neurological examination normality, and only presence of tenderness in the hip joints and lumbar spine. Regarding the hip, there is a listing at 1.02A, as far as ineffective ambulation. Claimant can ambulate without assistive device, as far as the treating—numerous treating providers are concerned. Therefore, I could not equal or meet that listing. The purpose of equaling is *only intensity of pain management*. If the two arthroscopies, one on each hip, or the laminectomy on the lumbar spine were not done there would not have been any equaling of the listing.

---

[2] *See, e.g.*, R. 36 ("The right hip pain documentation from the orthopedic surgeon is at exhibit number 32F, page number 11, on 1/19/2015, when there is a report of MRI scan of the right hip reported to show mild degenerative changes."); *id.* ("Her flexion of the hip was 95 degrees. Although normal, she was having discomfort with the full flexion of her right hip."); *id.* at 36-37 ("While the right hip pain was going on, claimant also complained of the left hip pain. There were no specific abnormal clinical findings, except [INAUDIBLE] with number 34F, page eight."); *id.* at 37 (noting that the surgeon only saw "mild" problems on MRI scan of left hip); *id.* ("And, except for possible enthesopathy, meaning inflammation of the tendons around the hip, there was no abnormality noted on the MRI scan of the left hip.").
[3] *See, e.g.*, R. 36 ("She received a local steroid injection, without any significant benefit."); R. 38 ("she continues to have the same symptoms unchanged" after all the various treatments).
[4] Exhibit 37F is Dr. Stover's March 11, 2016 three-page opinion letter.

5

R. 39. (emphasis added). This explanation sets out the two main rationales, both of which rely on a comparison between the closed period and the other two periods. The first rationale is that Dr. Stover did not find any "neurological abnormalities" on March 11, 2016. The second rationale is the one mentioned in the first excerpt, which is that Plaintiff had "no further invasive procedures" after March 11, 2016 and no longer had an "intensity of pain management." In this second excerpt, Dr. Jilhewar did not mention the injections when referring to pain management, but only mentioned the two hip surgeries and a laminectomy, a type of back surgery.

The laminectomy reference caught the ALJ's eye. She questioned whether Plaintiff had back surgery. Dr. Jilhewar began to cite to a page of the record but then backed off and stated that he had been unable to find a surgical report in the record. The ALJ turned to Plaintiff and asked if she had surgery. She said no. Dr. Jilhewar responded: "maybe the records are not hers then?"[5] R. 40. After some more back and forth, everyone agreed that Plaintiff did not have back surgery. The ALJ then asked whether this new fact changed the doctor's opinion. Despite having just stated that Plaintiff would not have met the listing if she had not had the back surgery (among other things), Dr. Jilhewar stated that his opinion remained the same because Plaintiff still had the two hip surgeries, as well as steroid and facet joint injections. R. 41.

After a few more questions from the ALJ, Plaintiff's counsel took over the questioning. Counsel focused on the issue of treatment. Set forth is the entirety of her cross-examination:

> Q Doctor, you said that she equals based on intensity of pain management there for a little bit when she was having the injections is that right?

---

[5] It is not clear what Dr. Jilhewar meant by saying the record is not "hers." It is possible that part of another file had gotten mixed in with Plaintiff's file. This would not be an unheard of scenario. *See, e.g. Mirsada I. v. Saul*, 19-CV-50027, 2020 WL 4437828, *2 (N.D. Ill. August 3, 2020) (the testifying expert initially "confused the files from two disability claimants" and wrongly believed that the Plaintiff "was smoking three joints a day"; although the mistake was corrected later in the hearing, it created a general "skepticism" towards the doctor's testimony).

A That's correct.

Q So, I know she hasn't had any injections recently, but it seemed to me like that was more, not because she didn't have pain, but more so because the injections didn't really help. I mean—did—I'm just wondering your take on that because I don't know, if the injections really didn't help as she testified today, that—you know—she should continue to do that, to undergo that.

A What I'm looking for—I'm sorry—what I was looking for—consideration for spinal cord stimulator, for example—her consideration for the pain management by other means other than oral medications.

Q Okay. So—

A And, I did not—I did not find that.

Q And, you did see she's on the oral medicines then. I think Tramadol is one of the more recent ones that she's been on.

A Yeah. This is for information purposes only.

Q Okay.

A Tramadol doesn't have the same potency as hydrocodone. The claimant told the provider that she was allergic to hydrocodone, with the nausea, vomiting, and dizziness.

Q Okay. So, you're looking for some type of escalation of treatment above and beyond the pain medicine and the injections. Is that right?

A That is correct.

Q Okay. All right. Then, I—

A The injections had stopped anyhow, not because of that. The injections are not there anymore.

ATTY: Okay. All right. Thank you. I don't have anything further.

R. 42-43.

After reviewing this testimony and checking it against the record, the Court finds that it rests on several factual errors and is also vague and incomplete at several critical points.

The Court will first look at the "invasive procedures" rationale. As noted above, Dr. Jilhewar's initial analysis was based on the mistaken belief that Plaintiff had back surgery. Although this error was arguably significant, it was corrected during the hearing thanks to the ALJ's oversight. So, this error standing alone would be harmless error. But the fact that Dr. Jilhewar misread the record on this one point adds to the unease about his overall testimony.

Another fact error, one not caught during the hearing or after, is the date the invasive procedures began. Dr. Jilhewar stated that they started on June 20, 2014 when Plaintiff received a pain injection. Although Dr. Jilhewar did not explain precisely what constituted an invasive procedure, he did state that these procedures were "usually [] epidural steroid injections." R. 35. So, we know that epidural steroid injections clearly would qualify under his definition, and presumably so too would other similar injections such as facet point injections. However, in reading the record, the Court noted that multiple sources indicated that Plaintiff had several injections before June 20, 2014. According to Dr. Coe's summary of Plaintiff's medical history, a summary the Commissioner has not disputed, Plaintiff had these four earlier injections:

- January 24, 2014 ("lumbar epidural steroid injection and right piriformis block")
- April 17, 2014 ("right hip steroid injection")
- May 1, 2014 ("left hip steroid injection")
- May 30, 2014 ("fluoroscopically-directed sacroiliac joint block")

R. 1616-18. Dr. Jilhewar was apparently unaware of this evidence because it seems to contradict his testimony. If Plaintiff had an epidural steroid injunction as early as January 24, 2014, then under Dr. Jilhewar's own rules of analysis, the closed period should have begun some five months earlier.[6]

---

[6] Plaintiff did not point out this error. Perhaps there is some explanation not apparent to this Court. The only possible counter-argument this Court can envision would be if Dr. Jilhewar were to make a very fine-grained distinction that the particular type of injection on June 20th was different in kind, and was therefore more invasive, than the earlier ones. But this argument seems implausible since Dr. Jilhewar specifically stated that epidural injections qualified as invasive procedures under his definition.

8

A similar factual error occurs at the back end of the closed period, although this one was not Dr. Jilhewar's fault. Dr. Jilhewar asserted that Plaintiff had no more injections after March 11, 2016. However, this statement is inaccurate because, as both sides agree, Plaintiff had at least five more injections, three in 2016 and two in 2017. Dkt. 11 at 12-13; Dkt. 16 at 8. It is unfortunate that the records documenting this fact were not available when Dr. Jilhewar testified. However, putting fault aside, the fact still remains that Dr. Jilhewar's analysis rests on another factual error. We cannot know if he would have changed his opinion if he had known these additional facts.

Turning next to Dr. Jilhewar's second main rationale, it also rests on a shaky factual foundation. Dr. Jilhewar noted that Plaintiff's condition improved based largely on the fact that Dr. Stover's examination on March 11, 2016 did not find any "neurological abnormalities." The implied premise is that Plaintiff did have such problems during the closed period. (This is how the ALJ interpreted his testimony.) But the problem with this rationale is that Dr. Jilhewar did not cite to evidence to support this assumption. As noted above, he stated the opposite. *See* R. 38 (observing that there was an "absence of neurological abnormality *throughout* the medical record") (emphasis added); R. 34 ("The first severe physical impairment is degenerative disc disease of the lumbar spine, with the symptoms of right lumbar radiculopathy, *without documentation of any neurological abnormalities*.") (emphasis added). Neither of these two statements were confined to a discrete time period. So, it is perplexing why Dr. Jilhewar later concluded that, based solely on Dr. Stover's one examination, Plaintiff had suddenly improved. This conclusion is at odds not only with Dr. Jilhewar's two earlier statements, but also with Dr. Stover's broader opinion that Plaintiff had not improved *despite* the recent treatments. We can

9

find nothing in Dr. Stover's opinion suggesting that he saw any type of U-shaped trajectory resembling Dr. Jilhewar's theory.

In addition to these factual problems, which are significant, a broader problem is that the listing analysis is thin and feels pieced together at the last minute. At issue is Listing 1.04 ("Disorders of the spine"). This is an often-litigated listing, one claimants frequently argue was insufficiently analyzed by ALJs. Here, the situation is reversed to some degree, with Plaintiff benefiting at least in part from a cursory analysis. She has little incentive to highlight any weaknesses in that analysis because she is trying to use it as a springboard to build her larger case for permanent benefits. The Commissioner has also not challenged this analysis. But this Court cannot pass over it so easily. Dr. Jilhewar did not mention the particular requirements of Listing 1.04A or indicate whether Plaintiff could *meet* any of the many technical requirements of the listing. Instead, he concluded, based on two rationales, that Plaintiff *equaled* all those requirements. But his rationales are vague. It is not clear how they approximate the listing requirements because Dr. Jilhewar provided no real explanation.

In sum, the Court finds that Dr. Jilhewar's analysis contains too many errors and unanswered questions to serve as an adequate foundation for the ALJ's ruling. This finding is enough to justify a remand because the ALJ gave great weight to Dr. Jilhewar's testimony, adopted his framework, and did not rely on any other medical opinion. But the Court will still consider the ALJ's decision based on the possibility that the ALJ somehow was able to successfully navigate around these problems.

The short answer is that she was not. On the surface, the ALJ did not acknowledge any concerns with the doctor's testimony, giving several reasons for why it was more credible than

10

the opinions of Dr. Stover and Dr. Coe. But upon closer examination, the ALJ analysis shows that she recognized that Dr. Jilhewar's framework was lacking in evidentiary support.

Although the ALJ gave his testimony great weight, the reasons are largely boilerplate and unconvincing. The ALJ stated that Dr. Jilhewar had "review[ed] the entirety of the longitudinal record as of the date of the hearing" and that the issues were "well within his expertise." R. 85. As for the former claim, the ALJ's carefully worded statement tiptoes around the problem that Dr. Jilhewar never saw exhibits 42F, 43F, and 44F. These exhibits covered much of the treatment history after March 11, 2016. As for the claim about expertise, Dr. Jilhewar specializes in gastroenterology whereas Dr. Stover specializes in orthopedic surgery.

Aside from this boilerplate discussion, the ALJ did not further discuss the details of Dr. Jilhewar's testimony. Notably, the ALJ cited to different evidence to support her analysis. But this attempt to bring in new evidence runs into the problem that the ALJ was necessarily playing doctor in evaluating it. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (ALJs should "rely on expert opinions instead of determining the significance of particular medical findings themselves").

The ALJ's central claim was that the objective evidence showed that Plaintiff had "significant abnormalities," including specifically neurological abnormalities, during the closed period but that she had none thereafter. R. 79. As noted previously, Dr. Jilhewar did not provide evidence to support these contentions. The ALJ tried to quietly fill in this gap. The ALJ first summarized a few findings from several MRIs. The mere fact that the ALJ was interpreting MRI results is one form of doctor playing.[7] But this point aside, the Court cannot discern from the

---

[7] *See Akin v. Berryhill*, 887 F.3d 314, 317 (7th Cir. 2018) (remanding: "without an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment."); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (ALJ failed

11

ALJ's summary how the MRI results demonstrate that Plaintiff's condition first worsened at the start of the closed period and then improved at the end of that period. The ALJ quoted some MRI findings but never made an apples-to-apples comparison to show a change over time. For example, the ALJ stated that a November 24, 2014 lumbar MRI "showed disc bulging at L5-S1." R. 79. However, the ALJ did not acknowledge that, according to Dr. Coe's summary, a 2008 lumbar MRI also showed disc bulging at L5-S1, raising a question of whether any change had occurred. R. 1615. The record contains many MRIs, some of the hip and some of the back, going back many years. These were analyzed and compared by many treating physicians. If the ALJ's conclusion was correct, then she presumably could have found a statement from one of these doctors documenting a deterioration and then an improvement lining up with Dr. Jilhewar's chronology. But no such evidence has been cited.

As for the specific issue of neurological abnormalities (a term that is never defined), the ALJ cited to one piece of evidence insofar as this Court can tell. It is the following: "During the closed period of disability, physical examinations revealed neurological abnormalities such as diminished ankle jerks bilaterally and decreased left knee jerks (Exhibit 16F/14)." R. 79. These two observations were taken from the treatment notes of Dr. Martin Gryfinski, who examined Plaintiff on September 19, 2014 (*i.e.* within the closed period). But this evidence is a classic case of cherrypicking in which minor observations buried in the treatment notes are extracted to suggest a conclusion at odds with the larger takeaway of the notes when read as a whole. Most of Dr. Gryfinski's findings were normal or indicated only mild problems.[8] Based on these findings,

---

to submit MRI, which was "new and potentially decisive" evidence, to the "medical scrutiny" of an expert).

[8] *See, e.g.* R. 755 ("moves with no overt signs of discomfort, arises from a chair with no difficulty"; "can flex forward fully with modest complaints in her low back and no complaints in either lower extremity. C/O increased discomfort in extension"; "Normal mobility and curvature"; full range of motion in both hips; "balance and gait intact"). It is important to remember in all this discussion that objective evidence

he thought Plaintiff could return to work. Here is his explanation: "Nothing to offer from surgical standpoint and in my opinion has exhausted conservative care, suggested return to work and move on." R. 755. The fact that the ALJ strained to find this marginal piece of evidence raises doubt about her larger conclusion that significant neurological abnormalities were present during the closed period.

Turning next to the issue of treatment, the ALJ claimed generally that Plaintiff received less and less treatment over time after the closed period and that on the whole she had "fewer abnormalities" and that her condition was "much improved." R. 84. This portion of the ALJ's decision mostly discussed the evidence from the exhibits submitted after the hearing. The ALJ did not submit this evidence to Dr. Jilhewar to see if it changed his opinion. So, this analysis is again doctor playing.

In addition, the ALJ's improvement rationale needs further analysis to be valid. Although Plaintiff's treatment did not precipitously stop after March 11, 2016 as Dr. Jilhewar erroneously claimed, it does appear that the treatment decreased somewhat in frequency. How much so is a point of debate in the briefs. But even accepting the ALJ's and the Commissioner's position that the treatment was materially less frequent, this does not necessarily prove the ALJ's larger thesis. The ALJ failed to explore possible explanations for the diminution in treatment. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin"). These include: (i) Plaintiff testified that she was hampered by lack of insurance for a period and had to pay for certain procedures out of pocket; (ii) Plaintiff

---

is not the sole criterion used to evaluate subjective pain. *See Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) ("an administrative law judge may not deny benefits on the sole ground that there is no diagnostic evidence of pain").

13

testified that earlier treatments did not work and that her doctors basically told her it would be futile to keep trying them; and (iii) Plaintiff testified that her doctors told her to "live with [the pain]," meaning that no viable options existed. R. 29-31. Many of these questions require medical expertise to evaluate, but the ALJ conducted this analysis largely on her own.[9] This topic deserves more investigation and analysis on remand.

For all the foregoing reasons, the Court finds that a remand is required. The Court will not address any remaining issues in the briefs because they can be considered on remand. Dr. Jilhewar's testimony is the main reason for the remand. We have not really gotten to what was supposed to be the main event—the putative battle of the experts. On this issue, we agree in general with Plaintiff's complaint that the ALJ too quickly dismissed Dr. Stover's and Dr. Coe's opinions on the ground that they were given (in particular Dr. Coe's opinion) during the closed period and could not speak to Plaintiff's later condition. This fact does not mean that all their findings could be simply dismissed out of hand.

A final observation about these two opinions. Plaintiff believes they support her claim that she could not work even a sedentary job. Maybe Plaintiff is right, but these two opinions also suggest that the question was a close call. Although both doctors expressed reservations about whether Plaintiff could work at all, they both indicated that she *might* be able to do sedentary work *if* she were allowed to change positions throughout the day. The ALJ found that Plaintiff could do sedentary work with various restrictions, but none of these restrictions dealt specifically with the need to change positions. This issue should be considered explicitly on

---

[9] Dr. Jilhewar addressed this topic briefly when he referred vaguely to the possibility of Plaintiff trying a spinal cord stimulator and when he stated that he expected that Plaintiff would "escalate" her treatment in some way if she still had severe pain. But the ALJ did not explicitly rely on this testimony, and it is unclear from the statements of Plaintiff's treating physicians whether a spinal cord stimulator could work for Plaintiff.

14

remand as it appears to be one of the key gaps between the two sets of experts. If this gap were closed by further analysis, then it is possible that this case could be resolved by a truce rather than a battle. But this question, as well as the others, must await a deeper analysis on remand after consultation with a well-informed expert.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, the Commissioner's motion is denied, and this case is reversed and remanded for further consideration.

Date: November 19, 2020          By: _____
                                     Lisa A. Jensen
                                     United States Magistrate Judge

15